Filed 3/29/24  P. v. Nukida CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TIM MAKOTO NUKIDA,<br><br>    Defendant and Appellant. | H050513<br>(Santa Cruz County<br>Super. Ct. No. 20CR03181) |

In 2022, a jury found defendant Tim Makoto Nukida guilty of 19 counts stemming from his sexual abuse of a child on various occasions over a period of seven years.  The victim in all counts, Jane Doe, was Nukida's stepdaughter.  The trial court sentenced Nukida to a total aggregate term of 112 years and eight months in prison.

On appeal, Nukida raises the following arguments related to his trial: (1) the trial court erred in admitting expert testimony about Child Sexual Abuse Accommodation Syndrome (CSAAS); and (2) the trial court erred in instructing the jury on CSAAS with an incorrect version of CALCRIM No. 1193.  With respect to his sentence, Nukida argues: (1) his aggregate sentence of 112 years and eight months is cruel and unusual under the United States and California Constitutions; and (2) the trial court erred in ordering him to pay a $20,000 restitution fine, which exceeded the maximum fine permitted under Penal Code[1] section 1202.4, subdivision (b).  The Attorney General

---

[1] Undesignated statutory references are to the Penal Code.

concedes that the court may have erred in its imposition of the restitution fine but argues that the matter should be remanded for the trial court to clarify the record regarding the applicable statute for the fine and correct the amount ordered only if necessary.

For the reasons explained below, we reverse the $20,000 restitution fine and remand for the trial court to clarify the statutory basis for the fines ordered and exercise its discretion within the limits of that statute. In all other respects, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Charges*, *Trial*, *and Sentencing*

On September 12, 2022, the Santa Cruz County District Attorney's Office filed a first amended information charging Nukida with 19 criminal counts as follows: six counts of committing a lewd act upon a child under the age of 14 (§ 288, subd. (a); counts 1-2, 6-7, 17-18); 12 counts of committing a forcible lewd act upon a child under the age of 14 (§ 288, subd. (b)(1); counts 3-5, 8-16); and one count of committing a lewd act upon a child between the ages of 14 and 15 years old and 10 or more years younger than Nukida (§ 288, subd. (c)(1); count 19).

On September 14, 2022, after a 12-day trial, the jury found Nukida guilty on all 19 counts as charged.

On October 19, 2022, the trial court sentenced Nukida to an aggregate term of 112 years and eight months in prison. Nukida's sentence consisted of the following: 12 consecutive terms of the middle term of eight years for committing a forcible lewd act upon a child under the age of 14 (counts 3-5, 8-16); the middle term of six years on one count of committing a lewd act against a child under the age of 14 (count 1); six consecutive terms of two years (one-third the middle term of six years) for committing a lewd act upon a child under the age of 14 (counts 2, 6-7, 17-18); and one consecutive term of eight months (one-third the middle term of 24 months) for committing a lewd act upon a child between the ages of 14 and 15 years old and 10 or more years younger than Nukida (count 19).

2

In addition, the trial court imposed a restitution fine of $20,000,[2] an additional parole revocation fund fine of $20,000, suspended pending successful completion of parole (§§ 1202.4, subd. (b), 1202.45), and victim restitution.

Nukida timely appealed.

## B. Factual Background

### 1. Prosecution's Case

#### a. Nukida's Relationship with Jane Doe

Nukida began dating Jane Doe's mother, E.V.[3] in 2007 after E.V. separated from Jane Doe's father. That same year, E.V., Jane Doe, and Jane Doe's brother, I.V. moved in with Nukida. E.V. and Nukida married in approximately 2008 or 2009, at which time Nukida began financially supporting E.V. and her children. In August 2008, Nukida, E.V., I.V., and Jane Doe moved to the Almaden Lake Apartments in San Jose (Almaden Lake) where they resided for approximately three years.

#### b. Jane Doe's Testimony

Jane Doe was approximately six years old when the family moved to Almaden Lake and slept in her own room at the end of the hall. After moving to Almaden Lake, Nukida began entering Jane Doe's bedroom early on some mornings, undressing her, and touching her back and buttocks. Jane Doe woke up when Nukida came into her bedroom on the first occasion, but kept her eyes closed as he undressed her. Nukida continued to engage in this behavior once or twice a month, and on occasion, he also took off his

---

[2] On the record, the trial court stated that it was imposing $20,000 in "fines" without specifying the type of fines or an applicable statute. However, the minute order states that this was a restitution fund fine pursuant to "1202.4 PC," which presumably was a reference to section 1202.4, subdivision (b)(1).

[3] We refer to the witnesses in the proceedings by their initials only to protect their personal privacy interests pursuant to California Rules of Court, rule 8.90(b)(10), (11).

pants, touched Jane Doe's vaginal area, and pressed his penis against her vagina. Afterwards, Nukida got dressed, helped Jane Doe get dressed, and left the room.

On one occasion, Jane Doe was by herself folding laundry in the Almaden Lake laundry room when Nukida came in and began talking with her. Nukida then closed the door, pulled his pants down to his ankles, and tried to push Jane Doe's head down towards his penis while holding it up in one hand. Jane Doe pulled away and left the room. Nukida also approached Jane Doe approximately three to five times in the kitchen at Almaden Lake, "groped" her, and touched her buttocks and vaginal area over her clothes. On some of these occasions, other people, including E.V., were in the apartment but in another room.

Jane Doe stated that Nukida's contact was "unwanted," and she was confused and did not fully understand what was going on. At the time, she did not tell anyone what had happened.

In 2011, the family moved from Almaden Lake to a house on Tabor Drive in Scotts Valley (Tabor house). Jane Doe's bedroom was upstairs, while the master bedroom, which was shared by E.V. and Nukida, was downstairs. While living at the Tabor house, Nukida often led Jane Doe downstairs into the closet of the master bedroom and closed the door. Once they were inside the closet, Nukida took off Jane Doe's clothes and occasionally took off his own clothes, then touched Jane Doe's vagina and his penis. He frequently placed Jane Doe's hand on his penis and directed her to rub it. Jane Doe also testified that at least once a month while in the closet, Nukida would hug Jane Doe from behind and "grind" into her by rubbing his groin on her hip or buttocks.

A few times each month, after Nukida brought Jane Doe down into the master bedroom, he undressed her and himself, leaned Jane Doe on her back over the bed, and pressed his penis into her inner thigh and near her vaginal area to simulate having sex with her, although he did not actually place his penis inside her vagina. While he did

4

this, Nukida occasionally made grunting noises or kissed Jane Doe on her cheek or lips, but never said anything to her. The interactions lasted approximately five to ten minutes.

On several occasions, while Jane Doe was watching television with Nukida in the living room, Nukida moved closer to her and either put her hand on his penis over his pants or unzipped his pants and put her hand directly on it. Nukida also came into the bathroom three times while Jane Doe was taking a bath, opened the shower curtain, and looked at Jane Doe while she was naked; on one such occasion, he kneeled over the bath and touched Jane Doe's thigh. After these incidents, Jane Doe began locking the door while taking a bath.

Jane Doe estimated that overall, she experienced unwanted touching by Nukida on a weekly basis while the family lived at the Tabor house. However, she did not tell E.V. about what was happening because she was afraid Nukida would stop supporting them financially. Nukida also expressed to her at one point that the extra attention and physical touching were his way of making up for the lack of attention Jane Doe got from her parents, who were more focused on her brother I.V.

In approximately 2014 when Jane Doe was 12, Nukida lost his job and could no longer pay the mortgage on the Tabor home, resulting in the family moving to a smaller mobile home park in Scotts Valley. During this time, Jane Doe and I.V. initially stayed alone with Nukida in the mobile home, while E.V. stayed in San Jose. While living in the mobile home, Nukida touched Jane Doe over her clothes in her buttocks, chest, and vaginal area while in the kitchen; Jane Doe occasionally "froze" when this happened, but on some occasions, she exited the kitchen immediately. Nukida also attempted to lead Jane Doe into the master bedroom and touch her, but she stopped him right away and left. On one occasion while Jane Doe was already in the master bedroom, Nukida came in, closed the door, and tried to take Jane Doe's clothes off, but did not succeed because she left the room. At this point, Jane Doe knew what was happening was wrong, and she felt

5

"dirty." However, she still felt unable to speak up and tell E.V. because of the potential consequences, including the possible loss of Nukida's financial support.

In 2015, E.V. and Nukida divorced, and Jane Doe and I.V. moved with E.V. to an apartment on Gilda Way in San Jose. Nukida continued residing in Scotts Valley, but still kept in contact with E.V. and interacted with the family on occasion. However, Jane Doe did not regularly socialize with Nukida at this time as she was often busy or chose not to go with the rest of the family when they met him. However, on one occasion, Nukida came to the Gilda Way apartment to meet E.V. while Jane Doe was there alone. After letting him in, Jane Doe went to change for volleyball practice when Nukida came into her room, pulled down her shorts, and began touching her buttocks. Nukida also touched Jane Doe's chest through her clothes. Jane Doe indicated that she initially just stood still, then "snapped out of it," pulled up her shorts, and left shortly after. This was the final occasion that Nukida touched Jane Doe in a sexual manner.

### c. Discovery of Sexual Conduct

On March 16, 2019, Jane Doe attended I.V.'s birthday party, which was held at Nukida's mobile home in Scotts Valley. At the time, I.V. was residing in the mobile home with Nukida. After drinking some alcohol and becoming inebriated, Jane Doe began crying and revealed to I.V. that Nukida had touched her and engaged in inappropriate behavior. According to I.V., Jane Doe was "in distress" and crying in a manner he had never seen before. I.V. was very angry and tried to find out more information from Jane Doe, but she did not provide further details. I.V. did not confront Nukida with Jane Doe's allegations, but began avoiding him while continuing to live with him.

In March 2020, E.V. lost her job due to the COVID-19 pandemic. As a result, E.V. could no longer keep her apartment in Aptos, where she and Jane Doe were living, and Jane Doe had to move in with her father. After Nukida offered that E.V. move in with him, E.V. decided to accept his offer and informed Jane Doe that she (E.V.) would

be moving in with Nukida. Jane Doe was very frustrated to hear this and told E.V. " 'don't do this,' " that Nukida did not deserve E.V., and that she was making a mistake. When E.V. questioned her further, Jane Doe finally revealed that Nukida had touched her inappropriately in a sexual manner in the past "behind closed doors." E.V. indicated that Jane Doe was very upset and asked E.V. to forgive her because she " 'didn't know [she was] doing [or] what was going on.' " According to Jane Doe, E.V. was very shocked by the news and that she had not noticed anything for so many years; as a result, she did not move in with Nukida.

In April 2020, Jane Doe spoke with I.V. again about Nukida's past behavior with her and asked him to move out of Nukida's home. I.V. subsequently moved out a few months later in July 2020. Before moving out, I.V. confronted Nukida about Jane Doe's allegations.

After speaking with E.V., Jane Doe told her father about the sexual abuse and reported it to the Scotts Valley Police Department on April 16, 2020.

#### d. *Pretext Phone Call and Meetings*

After Jane Doe reported the sexual abuse to the police, the investigating officer, Officer Justin Milroy, arranged for her to make a pretext phone call to Nukida.[4] During the call, Nukida began talking immediately and indicated that he wanted to contribute $10,000 per year towards her college expenses as a gift to her. Nukida also offered to give Jane Doe his car after he purchased a new one. Jane Doe then said, "I've had a lot of time to think recently…and I just need some closure, um, about some things that happened between you and me when, um, when we lived together." Nukida responded, "[d]o you want to come over? Um, right now? I'd rather not talk about anything, you know, over the phone." Jane Doe indicated that she "didn't want to make a big deal

---

[4] As described by Milroy, a pretext call is frequently used in sexual assault cases, where the victim calls the suspect and attempts to engage him or her in a conversation to see if the suspect makes any incriminating statements or acknowledges the assault.

about it" and repeated that she was seeking "closure." Nukida again responded that he wanted to "discuss face to face," and not over the phone. The call ended shortly thereafter.

After the call, Jane Doe agreed to meet Nukida at a park in Scotts Valley. During the meeting, Milroy parked nearby in an unmarked vehicle, where he could still see Jane Doe, and equipped Jane Doe with a recording device to record the conversation. During their conversation, Jane Doe asked Nukida why he "did the things [he] did" to her because she was "so little" and didn't understand what was happening. Nukida replied that he "[didn't] understand it either." When Jane Doe attempted to discuss specific details about the location and number of times the assaults occurred, Nukida repeatedly stated "no, no, no." Jane Doe then asked Nukida to "not pretend" that nothing happened, to which Nukida responded that he was "not saying [he was] pretending." Nukida then claimed it was due to "his psyche," that he "didn't know what to say," and repeatedly apologized to Jane Doe. When Jane Doe asked him if he deserved punishment and should go to jail, Nukida responded, "Yes, if that's what it takes."

At Milroy's request, Jane Doe agreed to another meeting with Nukida in May 2020. Nukida met Jane Doe in her parked vehicle, while Milroy parked approximately four to five car lengths in front and equipped Jane Doe with two recording devices. During this conversation, Nukida began apologizing to Jane Doe for various events that had happened over the years, and repeated his offer to contribute $10,000 a year towards Jane Doe's college expenses. Nukida also offered for Jane Doe and E.V. to move into his home. When Jane Doe asked Nukida about what happened when she previously lived with him, Nukida responded that he was "sorry" and did not know what he could do. Nukida then spoke at length about a cycle of abuse that began with him observing his

8

mother abuse his sister.  He also talked about an incident during his childhood where he was lost in a graveyard.  He then stated:

"Some things I just don't understand.  Why some things happened.  I wonder if some of it is psychological, you know, psychological, that's deep-rooted trauma that happened way back…Something just something just clicked inside or something.  I don't know.  It's just too much, too much of a pattern there.  So, I'm not using any of this as an excuse.  I apologize for my behavior and I want I want to know what I can help with, what I can do, because I really care about you.  And I want to make sure you're well the rest of your life.  Whatever way I can do to help you uh get closure to that, to overcome that. I want to help.  If you want me to uh go to jail that's fine too. I can do that."

When Jane Doe indicated she was suffering from flashbacks, Nukida offered to "kill himself" and told Jane Doe to "just tell [him] what to do" to help her.  Jane Doe attempted to discuss the various incidents of sexual abuse with Nukida, but Nukida responded that he "[didn't] understand it," and "[didn't] recall" the first time he went into Jane Doe's room when she was six or seven years old.  He repeated that he "didn't understand" when Jane Doe asked him what his intentions were during the incidents of unwanted touching, why he had molested her, and whether she had done anything to "call this attention."  Jane Doe told him that she felt his offer to pay for her college tuition was an attempt to buy her silence, which Nukida denied.  Nukida then suggested he see a hypnotist to find out what really happened, and again stated that he would kill himself if Jane Doe asked him to.  As Jane Doe again attempted to talk to Nukida about the various incidents, Nukida continued to state that he "didn't understand it."  Finally, Nukida stated that he hoped there was "no government mind control going on," and spoke about "high-tech mind control."

9

Nukida ultimately stated that he would go to jail if Jane Doe wanted him to, because his life "was pretty much over." He then stated that he planned to leave everything to Jane Doe and her family, and offered to sign a will if she wrote up for him.

### e.  CSAAS evidence

Dr. Anthony Urquiza testified as an expert on child sexual abuse and child sexual abuse accommodation syndrome (CSAAS). Dr. Urquiza defined CSAAS as an educational tool to inform and educate therapists about common characteristics exhibited by children who have been sexually abused, including dispelling common myths or misconceptions therapists may have about sexual abuse. He noted that CSAAS was not used to diagnose or give an opinion on whether someone was the victim of sexual abuse.

Dr. Urquiza indicated that some of the common myths about child sexual abuse were that: (1) the victims disclose the incident right away; (2) the perpetrators are usually strangers, not someone the child knows or has regular contact with; and (3) the victims can be discerned easily because they exhibit visible signs of distress. He also explained how child victims of sexual abuse often respond or react to the abuse in ways that differed from an "adult" way of handling similar trauma. For example, Dr. Urquiza indicated that in most cases, the perpetrator is someone whom the child knows and has an ongoing relationship with. As a result, the perpetrator is often able to convince the child that disclosing would be negative or harmful, or cultivates a close relationship with them prior to the abuse such that the child does not feel comfortable disclosing.

### 2.  Defense's Case

### a.  Testimony of Nukida's Relatives

Four of Nukida's relatives testified on his behalf during the trial. Nukida's older sister, G.N., testified that because of their Japanese culture, her family was very reserved and not the "touchy-touchy" type of people. She indicated that she had a close relationship with Nukida and visited him on several occasions after he married E.V. and began living with E.V., Jane Doe, and I.V. G.N. indicated that Nukida had a reputation

10

in their family for being honest and truthful, and he would not touch anyone in the family inappropriately. G.N. also testified on cross-examination that she had never witnessed Nukida "act sexually" in front of her towards anyone, including adult women.

Nukida's sister, F.N., testified that she saw Nukida at least four times a year and had regularly interacted with E.V., Jane Doe, and I.V. during Nukida and E.V.'s marriage. F.N. also described Nukida as very honest and had never observed him behave inappropriately with her own daughter during their interactions over the past 26 years.

Nukida's youngest sister, E.B., testified that she interacted with Nukida, E.V., Jane Doe, and I.V. frequently during family trips and vacations, and also had a son who was the same age as Jane Doe. Like her sisters, E.B. described Nukida as very honest, and she did not believe he was capable of touching any child inappropriately based on her interactions with Nukida and observations of him around children. E.B. further testified on cross-examination that she and Nukida had never discussed his sexual preferences, and she had never observed him engaging in sexual activity.

Finally, Nukida's niece, J.F., testified that she had seen Nukida regularly throughout her life and had interacted with I.V. and Jane Doe during family social gatherings. J.F. testified that Nukida had always been very honest, respectful, and calm, and had respected boundaries with "all of us." Based on her observations and interactions with Nukida, J.F. believed he would never touch a child inappropriately. On cross-examination, J.F. clarified that she had seen Nukida approximately three to four times per year while he was married to E.V.

### b. Expert Witness Testimony

Clinical psychologist Dr. Mary Alumbaugh testified as an expert on Nukida's disposition to commit sexual offenses. Dr. Alumbaugh evaluated Nukida's developmental history by interviewing Nukida about his background, reviewing police reports, and reviewing the recording of the May 2020 conversation between Nukida and Jane Doe. Dr. Alumbaugh also administered various personality tests on Nukida. She

11

described Nukida's responses to the questions as representative of "underreporting," where he was very careful, deliberate, and defensive in how he responded to each question. Dr. Alumbaugh also evaluated Nukida's ability to function in interpersonal relationships, and determined that he had difficulty asserting himself in a relationship and taking control. The tests further revealed that Nukida had a low tendency to act out and be impulsive. Based on Nukida's overall performance on the tests, Dr. Alumbaugh did not find any indication that Nukida was experiencing a paraphilia[5] towards children, including prepubescent children.

On cross-examination, Dr. Alumbaugh acknowledged that she had only performed this type of evaluation, known as a Stoll evaluation, five times. She also did not compile an extensive sexual history on Nukida, including the number of sexual partners he had, his sexual preferences, or how frequently he had sex. Dr. Alumbaugh confirmed that based on Nukida's test results, she felt Nukida portrayed himself as someone "exceptionally free of common shortcomings" that most people would admit to, and that he was reluctant to admit any dysfunction or faults across many areas. She further concluded that he may be "insensitive to negative consequences associated with his behavior tending to minimize the negative impact that his behavior has on others and himself." Lastly, Dr. Alumbaugh noted that someone with Nukida's test results could still molest children as the tests were not designed to answer that specific question.

### c. Nukida's Testimony

Nukida testified in his own defense. He stated that he was born in Sapporo, Japan, and moved to the United States when he was six years old. Nukida met E.V. at a health spa and began dating her, but initially felt bad about pursuing a relationship with her because she was still married at the time. After Nukida. E.V., Jane Doe, and I.V. moved to Almaden Lake, Nukida would typically go straight to work in the morning while E.V.

---

[5] Dr. Alumbaugh defined paraphilia as a "sexually deviant disorder."

12

would take care of the children.  From the time they moved to Almaden Lake, E.V. was 100 percent dependent on Nukida to pay all expenses and did not have much money of her own.

Nukida denied any of the incidents of inappropriate touching that Jane Doe alleged to have taken place at Almaden Lake.  He also denied that any incidents took place at the Tabor house.  Lastly, while he confirmed that Jane Doe and I.V. lived with him in his mobile home for a period of time after he and E.V. separated, he denied ever grabbing Jane Doe in the kitchen or bedroom of the mobile home.  Nukida could not think of or identify anything in hindsight that Jane Doe could have misconstrued as inappropriate or harmful touching.

In 2015, Nukida and E.V. divorced, and E.V. moved with both children to her sister's home.  While Nukida and E.V. were not in touch for approximately one year, E.V. subsequently reestablished contact, and Nukida suggested that she move into the Gilda Way apartment.  Nukida subsequently began paying the rent for the Gilda Way apartment.

Nukida admitted that on one occasion, he had arrived at the Gilda Way apartment to take Jane Doe to a volleyball tournament.  E.V. was not home, but he began chatting with Jane Doe, who was already dressed in her volleyball uniform.  During the conversation, he followed Jane Doe into her room, where he patted her on the buttocks as a "form of affection;" he further described this as a "congratulatory pat" for Jane Doe doing so well on the team despite being one of the shorter players.  Nukida indicated that Jane Doe was about 15 years old at the time and did not invite him to pat her this way.  However, he denied squeezing or rubbing Jane Doe's buttocks or pulling down her shorts.  However, Nukida stated he later felt bad about what he had done because it was the "wrong thing to do" as Jane Doe's stepfather.

Nukida continued to remain involved in E.V.'s life after the divorce and assisted her financially.  He also visited frequently and spent time with Jane Doe and I.V.

socially. However, in 2019, Jane Doe asked to come meet him at his mobile home in Scotts Valley, which she did not do regularly. When Jane Doe arrived, Nukida was sleeping and did not answer the door, which he believed made her very angry. After this incident, Jane Doe began acting "cold" towards Nukida, which he attributed to her being jealous that he was spending more time with I.V. However, despite this incident, Nukida still wanted to contribute to Jane Doe's college tuition because he was "proud" of her and knew E.V. would not be able to pay on her own.

Nukida later testified that when he first met Jane Doe in the park in 2020, he did not understand why she was bringing up "all these things" and "denied everything." However, he ended up having to walk away because Jane Doe became "emotionally upset" and he was worried she would explode into a tantrum. Nukida testified that even though he did not understand what Jane Doe was saying, he still wanted to "mend" his relationship with her and agreed to meet her again.

When he met Jane Doe the second time, Nukida claimed that he was only apologizing about the incident at the Gilda Way apartment as well as the 2019 incident when she came to visit him while he was asleep. In an effort to "manage" the situation, he offered to go to jail and kill himself. He also admitted that he was "fixated" on the Gilda Way incident to such an extent that he wasn't paying as much attention to the other incidents Jane Doe was describing.

On cross-examination, Nukida reiterated that his responses to Jane Doe's accusations were his attempts to "manage the situation," and he offered to go to jail and kill himself because he was "desperate" to mend the relationship. Nukida characterized the sexual abuse allegations against him as "all lies" and believed Jane Doe was making the allegations up because she was jealous of the attention he gave I.V. However, Nukida admitted he never confronted Jane Doe with this belief.

14

## II. DISCUSSION

### A. Admission of CSAAS Expert Testimony

Nukida argues that the trial court erred in allowing Dr. Urquiza to testify over his objection. First, he claims that the CSAAS testimony was irrelevant and inadmissible under Evidence Code section 801 because the misconceptions it seeks to correct are no longer prevalent in society and were not present among the jurors in the instant case. Second, he argues that the prosecution failed to establish Dr. Urquiza's opinions were reliable amongst the scientific community. Lastly, Nukida contends that Dr. Urquiza's testimony exceeded the bounds of permissible CSAAS evidence because he testified about the characteristics of persons who sexually abuse children and the typical nature of the abuse, not just the characteristics of sexual abuse victims. Nukida therefore concludes that his constitutional rights to due process were violated because the CSAAS evidence was "used to unfairly corroborate and bolster [Jane Doe's] allegations against appellant."

As we explain below, we conclude the trial court did not err in admitting the CSAAS testimony and reject Nukida's arguments in their entirety.

### 1. Procedural Background

Before trial, the prosecution filed a motion in limine to admit Dr. Urquiza's expert testimony regarding CSAAS to disprove common myths and misconceptions about children's reactions to sexual abuse and to assist the jury in evaluating the victim's testimony. Specifically, the prosecution asked to offer expert testimony "as to molestation victims in general so as to dispel common misconceptions which may exist among the jurors about how victims react to such abuse and how they go about disclosing the abuse, as well as the fact that there is no 'typical' child molester." The prosecution further argued that a limiting instruction could be given admonishing the jury that the evidence was admissible solely for the purpose of showing that the victim's reactions

15

were not inconsistent with having been molested, and not to assess the truth of the victim's claim.

Nukida's trial counsel moved to exclude the CSAAS evidence in its entirety. Counsel claimed that such evidence was not generally accepted in the scientific community and requested that the court hold a *Kelly/Frye*[6] hearing before admitting the evidence. Counsel also argued that if Dr. Urquiza was permitted to testify, his testimony should be limited to "*only* the myths or misconceptions that are present in this case that are beyond the common knowledge of the jurors." Counsel additionally contended in court that there "really [was] no misconceptions about [late reporting] in society anymore" such that the testimony would be irrelevant.

The trial court ruled that the CSAAS evidence was admissible so long as Dr. Urquiza did not render an opinion as to what happened, who did what, or who was telling the truth. The court noted that "not all jurors are going to be familiar with the subject appropriate for expert testimony." The court informed Nukida's counsel that he could object if the testimony exceeded the permissible scope.[7]

At trial, Dr. Urquiza testified as an expert in CSAAS. He testified that CSAAS was developed in the early 1980s as an educational tool for therapists to address myths and misconceptions they may have about the behavior of child sexual abuse victims. There are five general categories of CSAAS: secrecy, helplessness, entrapment or accommodation, delayed and unconvincing disclosure, and retraction.

According to Dr. Urquiza, most child victims of sexual abuse have some type of ongoing relationship with their abuser. The perpetrators are usually bigger, older,

---

[6] This rule, now known as only the *Kelly* rule (see *People v. Bolden* (2002) 29 Cal.4th 515, 545 (*Bolden*)) refers to the test for reliability of expert witness testimony as set out in *People v. Kelly* (1976) 17 Cal.3d 24.

[7] The record does not reflect that counsel made any objections during Dr. Urquiza's testimony.

16

stronger, and often in a position of control or authority in the child's life. The perpetrators also use various methods of coercion to ensure the child stays quiet. This can range from overt threats that something bad might happen, to intimidating the child into staying quiet, to befriending the child and making the child care about them enough that he or she feels "stuck" about reporting unwanted contact or touching.

Many children feel unable to fight back or resist the abuser and submit to the abuse, particularly if the abuser is someone in a position of significant authority in their life. Child sexual abuse victims generally feel trapped and will often take steps to accommodate or attempt to cope with the abuse by compartmentalizing their emotions and "disassociating" while being abused, or finding ways to make it harder for the perpetrator to have access to them.

Dr. Urquiza testified that most children can sometimes take months, years, or even "decades" before they initially disclose the abuse. In addition, the amount of information the child initially discloses is often not fully articulate or detailed, and the child often will "test the waters" by sharing only a little information to gauge how supportive of a reaction they receive. Similarly, children often have difficulty remembering the details of the abuse the more frequently it occurred, thereby resulting in inconsistent or unconvincing disclosures.

Dr. Urquiza clarified that a child did not have to go through all five stages of CSAAS to be classified as a victim and that CSAAS is not a mechanism to diagnose whether a particular child has been sexually abused. In addition, he testified that he was not familiar with the facts of this case or any of the parties related to the case, and was not offering an opinion as to whether Jane Doe had been sexually abused.

### 2. Applicable Law and Standard of Review

Expert opinion testimony is admissible when the subject matter is "beyond common experience" and the opinion would assist the trier of fact. (Evid. Code, § 801, subd. (a).) "'When expert opinion is offered, much must be left to the trial court's

17

discretion.' [Citation.] The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion. [Citations.]" (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

"Trial courts may admit CSAAS evidence to disabuse jurors of five commonly held 'myths' or misconceptions about child sexual abuse. [Citation.] While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse. [Citations.]" (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*); see also *In re S.C.* (2006) 138 Cal.App.4th 396, 418; *People v. Wells* (2004) 118 Cal.App.4th 179, 188; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745 (*Patino*); *People v. Housley* (1992) 6 Cal.App.4th 947, 955-956; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449-450 (*Harlan*); *People v. Stark* (1989) 213 Cal.App.3d 107, 116-117.) CSAAS evidence "is admissible solely for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*People v. Bowker (*1988) 203 Cal.App.3d 385, 394 (*Bowker*).) "For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust." (*Ibid*.) CSAAS evidence "is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301, fn. omitted (*McAlpin*).)

18

### 3. Analysis

#### a. The Trial Court Did Not Abuse Its Discretion in Admitting the CSAAS Evidence

Nukida argues that the trial court abused its discretion because "[t]he misconceptions that CSAAS testimony has been upheld to refute no longer exist. Moreover, in this case, there was no evidence that any of the prospective jurors held the misconceptions that previously prevailed in our society." In support of this argument, Nukida largely cites scholarly articles and cases from other jurisdictions. We find this argument without merit.

The California Supreme Court ruled in *McAlpin* that CSAAS testimony is admissible to disabuse jurors of commonly held misconceptions about child sexual abuse victims' behavior and to explain seemingly contradictory behavior of a child sexual abuse victim. (*McAlpin, supra*, 53 Cal.3d at pp. 1300–1302.) As this court is bound by decisions of the California Supreme Court, Nukida's references to decisions from other jurisdictions that reached different decisions on the admissibility of CSAAs testimony have no effect on the binding nature of *McAlpin.* (See *People v. Ramirez* (2023) 98 Cal.App.5th 175, 216. ) Based on this binding precedent, as well as the substantial precedent set forth above regarding admissibility of CSAAS evidence, we conclude the trial court did not abuse its discretion when it ruled that the prosecution's proposed expert testimony on CSAAS was relevant and admissible for the limited purpose for which it was admitted in the instant case. (See *Lapenias*, *supra*, 67 Cal.App.5th at p. 172; *Patino*, *supra*, 26 Cal.App.4th at pp. 1744-1745; *People v. Perez* (2010) 182 Cal.App.4th 231, 245.)

#### b. CSAAS Evidence is Not Subject to the Kelly Rule

Nukida next argues that because CSAAS evidence has never been evaluated by the *Kelly* rule and its model has not been generally accepted in the scientific community, the trial court abused its discretion in admitting Dr. Urquiza's testimony. We disagree.

Under the *Kelly* rule, "evidence obtained through a new scientific technique may be admitted only after its reliability has been established under a three-pronged test. The first prong requires proof that the technique is generally accepted as reliable in the relevant scientific community." [8] (*Bolden*, *supra*, 29 Cal.4th at p. 544.)

The California Supreme Court has explained that the "additional scrutiny" under *Kelly*, which "imposes certain preconditions on the admission of evidence derived from a novel scientific technique or procedure.…'is justified because "[l]ay jurors tend to give considerable weight to 'scientific' evidence when presented by 'experts' with impressive credentials. We have acknowledged the existence of a '. . . misleading aura of certainty which often envelops a new scientific process, obscuring its currently experimental nature.' " ' " (*People v. Peterson* (2020) 10 Cal.5th 409, 457 (*Peterson*).)

However, unlike evidence that is based on a new scientific technique or procedure, expert *opinion* testimony is not necessarily subject to the *Kelly* test. The California Supreme Court has explained as follows: "[I]n most cases no similar caution is required before a jury considers expert opinion testimony. Unlike results 'produced by a machine,' to which jurors may 'ascribe an inordinately high degree of certainty,' jurors presented with the personal opinion of a witness, even an expert witness, 'may temper their acceptance of his [or her] testimony with a healthy skepticism born of their knowledge that all human beings are fallible.' [Citations.] For this reason, ' "[a]bsent *some special feature which effectively blindsides the jury, expert opinion testimony is not subject to Kelly*[]." ' [Citations.] Of course, some expert testimony may be 'based, in whole or part, on a technique, process, or theory which is new to science and, even more so, the law' [citation]; where the novel technique 'appears in both name and description

---

[8] Although the *Kelly* rule involves two more prongs regarding the qualifications of the testifying witness and the procedure used to perform the technique at issue (see *Bolden, supra,* 29 Cal.4th at pp. 244-245), Nukida does not contend that Dr. Urquiza's testimony failed to satisfy these other two elements. Therefore, we do not discuss them further.

to provide some definitive truth which the expert need only accurately recognize and relay to the jury,' additional scrutiny under *Kelly* is warranted." (*Peterson*, *supra*, 10 Cal.5th at pp. 457-458, some italics added.)

In the instant matter, Nukida contends that the California Supreme Court applied *Kelly* to evidence regarding rape trauma syndrome in *People v. Bledsoe* (1984) 36 Cal.3d 236 (*Bledsoe*), and therefore, *Kelly* must be applied to CSAAS evidence as well. In *Bledsoe*, "expert testimony describing the [rape trauma] syndrome and applying it to [the] victim was used to prove that 'a rape in the legal sense had, in fact, occurred.'" (*People v. Stoll* (1989) 49 Cal.3d 1136, 1160 (*Stoll*), italics omitted.) However, "rape trauma syndrome was not devised to determine . . . whether, in fact, a rape in the legal sense occurred - but rather was developed by professional rape counselors as a therapeutic tool, to help identify, predict and treat emotional problems experienced by the counselors' clients or patients." (*Bledsoe*, *supra*, at pp. 249-250.) In other words, the scientific literature regarding rape trauma syndrome did "not . . . purport to claim that the syndrome is a scientifically reliable means of proving that a rape occurred." (*Id*. at p. 251.) The court therefore found that the evidence was inadmissible as it did not meet the *Kelly* test. (*Id.* at p. 1161.)

The Third District Court of Appeal subsequently indicated in *Bowker* that *Bledsoe* created an exception allowing for the admissibility of evidence related to rape trauma syndrome only for the limited purpose of " '[disabusing] the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths.' [Citation.]" (*Bowker*, *supra,* 203 Cal.App.3d at p. 391.) The court similarly found that notwithstanding *Kelly*, CSAAS evidence may similarly be admissible for the limited purpose of "disabusing the jury of misconceptions as to how child victims react to abuse." (*Bowker, supra,* 203 Cal.App.3d at p. 392.)

Although Nukida claims that the holding in *Bowker* reflected a misinterpretation of *Bledsoe* , the California Supreme Court subsequently made clear that its opinion in

21

"*Bledsoe* did not hold that the [*Kelly*] test applied to the expert opinion in that case" and that *Bledsoe* did not "discuss the test's relationship to 'syndrome' or other expert psychological evidence in general." (*Stoll, supra,* 49 Cal.3d at p. 1161.) Significantly, subsequent to *Bledsoe*, the California Supreme Court in *Stoll* concluded that where psychological testimony is based on methods that "are not new to psychology or the law" and "carry no misleading aura of scientific infallibility,' " the testimony is not subject to the *Kelly* rule. (*Stoll*, *supra*, 49 Cal.3d at p. 1157.) Notably, Nukida does not address *Stoll* in his argument.

In the present case, Nukida fails to demonstrate that CSAAS evidence is based on methods that are "new to psychology or the law" and that testimony about CSAAS carries a "misleading aura of scientific infallibility." (*Stoll*, *supra*, 49 Cal.3d at p. 1157; accord, *Peterson*, *supra*, 10 Cal.5th at p. 458.) Indeed, the case of *People v. Munch* (2020) 52 Cal.App.5th 464 (*Munch*), specifically found that with respect to CSAAS evidence, "we are not dealing with new experimental scientific evidence ' "not previously accepted in court." ' " (*Munch, supra,* 52 Cal.App.5th at p. 472.)

In the instant case, Dr. Urquiza had been a licensed psychologist for over 30 years and was the director at the U.C. Davis Care Center, a child abuse treatment program. Over the course of his work at the Center, he had treated over 1,000 children, including supervising and training others in their treatment of children. His expert testimony was therefore " 'based on [his] clinical experience with child sexual abuse victims and on [his . . .] . . . familiarity with professional literature in the area.' [Citation.] . . . Such expert testimony meets 'traditional standards for competent expert opinion, without need for additional screening procedures [under *Kelly/Frye*.]' " (*Munch*, *supra*, 52 Cal.App.5th at p. 473.) In addition, CSAAS evidence "has been ruled to be properly admitted by the courts of this state for decades." (*Id*. at pp. 468, 472.)

Furthermore, testimony about CSAAS does not purport to make any definitive statements about whether a child has been abused and instead simply attempts to dispel

misconceptions about the conduct of child sexual abuse victims. (See *Munch*, *supra*, 52 Cal.App.5th at pp. 468, 473; *Lapenias*, *supra*, 67 Cal.App.5th at p. 173.) Dr. Urquiza specifically testified that he knew nothing about the case or the facts, and did not know anyone related to the case. The California Supreme Court has also rejected the notion that the "use of 'syndrome' . . . terminology by a mental health professional makes the [testimony] seem 'scientific' to a jury, and thus invokes [*Kelly*]." (*Stoll*, *supra*, 49 Cal.3d at p. 1161, fn. 22 [court was "not persuaded that juries are incapable of evaluating properly presented references to psychological … 'syndromes' "].)

Finally, due to Nukida's failure to demonstrate the applicability of the *Kelly* rule to the CSAAS evidence in this case, we find unpersuasive his reliance on out-of-state authority regarding whether CSAAS evidence meets a *Kelly* (or *Frye*) requirement regarding general acceptance within the scientific community. (See, e.g., *State v. J.L.G.* (N.J. 2018) 234 N.J. 265, 301 ["we apply the *Frye* test and consider whether CSAAS has achieved general acceptance in the scientific community"].)

In conclusion, because Nukida does not establish that CSAAS evidence is based on methods that are "new to psychology or the law" and that the evidence carried a "misleading aura of scientific infallibility" (see *Stoll*, *supra*, 49 Cal.3d at p. 1157; accord, *Peterson*, *supra*, 10 Cal.5th at pp. 457-458), we find that the trial court did not abuse its discretion in admitting expert testimony about CSAAS without first conducting a *Kelly* test. (See, e.g., *Lapenias*, *supra*, 67 Cal.App.5th at p. 173 ["expert CSAAS testimony is not ' " 'scientific' " evidence' subject to the *Kelly* rule"]; *Munch*, *supra*, 52 Cal.App.5th at pp. 472-473 [CSAAS evidence not subject to *Kelly* analysis]; *Harlan*, *supra*, 222 Cal.App.3d at p. 449 [*Kelly* rule does not apply to expert testimony about the reactions of child molestation victims, where expert's "opinion was based on her clinical experience with child sexual abuse victims and on her familiarity with professional literature in the area"].)

### c. The CSAAS Testimony Did Not Exceed the Bounds of Permissible CSAAS Evidence

Nukida next argues that Dr. Urquiza's testimony went beyond the permissible scope of CSAAS evidence because it included his opinions about the abuser, locations where abuse typically occurred, the frequency of abuse, and a non-offending parent's knowledge of the abuse. Nukida claims that because such testimony did not focus on the typical reactions of child victims to abuse and, in fact, mirrored the "exact scenario" that Jane Doe testified to, those portions of Urquiza's testimony should have been excluded. We find no merit to this contention.

As set forth above, Dr. Urquiza testified to the five general stages of CSAAS and expressly stated that he had no knowledge of the facts of this case. Further, in reviewing Dr. Urquiza's testimony, it is apparent that the portions cited by Nukida were not attempts to draw parallels to the case, but instead provided further insight into the various stages of CSAAS. For example, in noting that an abuser is often someone already known or related to the child, Dr. Urquiza indicated that this allowed for the abuser to coerce the child into secrecy or contribute to the child's feeling of helplessness. Similarly, Dr. Urquiza discussed a non-offending caregiver or parent's lack of knowledge as it related to a child's helplessness or vulnerability. Lastly, Dr. Urquiza noted that the location of the abuse was important to dispel one of the common myths surrounding secrecy, namely, that the abuse typically happened in a "dark alley" or unknown place and with an unknown person. Accordingly, based on our review of the record, we find that Dr. Urquiza's testimony fell within the scope of permissible testimony, and the trial court did not abuse its discretion in admitting it.

### d. Admission of CSAAS Evidence Did Not Violate Due Process

Finally, Nukida contends that the admission of the CSAAS evidence violated his due process rights to a fair trial because it was irrelevant, unreliable, and inflammatory, as set forth in his above-described arguments.

Generally, a court's compliance with the rules of evidence does not violate a defendant's right to due process. (*Lapenias*, *supra*, 67 Cal.App.5th at p. 174, citing *People v. Hall* (1986) 41 Cal.3d 826, 834-835.) Reviewing courts have also routinely held the admission of CSAAS evidence does not violate due process. (See, e.g., *Patino*, *supra*, 26 Cal.App.4th at pp. 1744-1745 [trial court's admission of CSAAS evidence did not violate due process].) For the same reasons, we conclude that Dr. Urquiza's testimony about CSAAS did not violate Nukida's constitutional right to due process.

Further, we have already rejected Nukida's contentions that (1) the evidence should have been excluded as irrelevant; and (2) CSAAS evidence is unreliable and that the *Kelly* test must be applied. The "rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or 'gloss' raised" on appeal. (*People v. Scott* (2011) 52 Cal.4th 452, 487, fn. 29.) Having rejected each of the underlying claims of error in admitting the CSAAS evidence, we accordingly reject Nukida's due process claim.

### B. *Instructional Error*

Nukida next argues that the court erred in giving the jury a "version" of CALCRIM No. 1193, the instruction generally provided when a case involves CSAAS expert testimony. Nukida specifically argues that the court improperly failed to include language from CALCRIM No. 1193 that the expert testimony was also not evidence that Nukida committed the conduct with which he was not charged. Nukida further argues that the court erroneously used the wrong pronoun of "his" instead of "her", which "undoubtedly misled the jury" on how it should use the CSAAS evidence and resulted in them evaluating his credibility, as opposed to Jane Doe's as contemplated by the instruction. Nukida claims that due to these omissions and errors in the instruction, the prosecution's burden was lowered from guilt beyond a reasonable doubt in violation of Nukida's due process rights.

### 1. Trial Court Proceedings

Prior to instructing the jury and outside the jury's presence, the trial court indicated it had reviewed the instructions with counsel off-the-record. Defense counsel indicated he "was not adding anything" and only asked for one instruction (not CALCRIM No. 1193) to be pulled.

At the conclusion of evidence, the court instructed the jury pursuant to CALCRIM No. 1193 as follows: "You have heard testimony from Dr. Anthony Urquiza regarding [CSAAS]. [¶] Dr. Urquiza's testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [Jane Doe]'s conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of his testimony."

### 2. Applicable Law and Standard of Review

As a threshold matter, the Attorney General argues that Nukida has forfeited his claim of instructional error by failing to object to CALCRIM No. 1193 at trial. However, because Nukida contends the challenged instruction was an incorrect statement of law and affected his substantial rights under section 1259, we decide that we can consider the merits of his claim in spite of his failure to object below. (See *People v. Grandberry* (2019) 35 Cal.App.5th 599, 604; *People v. Gomez* (2018) 6 Cal.5th 243, 312.)

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) When we review a purportedly erroneous instruction, we consider " ' " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1028 (*Richardson*).) We consider the instructions as a whole and " 'assume

that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " (*Ibid*.)

### 3. *No Error in Instructing with CALCRIM No. 1193*

#### a. *Use of Incorrect Pronoun*

Nukida argues that the court's erroneous use of "his testimony" at the end of the instruction instead of "her testimony" would have led the jury to erroneously believe the instruction referenced the credibility of someone else's testimony apart from Jane Doe. Nukida notes that since he was a male and referred to in the previous sentence, the jury would have erroneously assumed that "his testimony" referred to Nukida and improperly used the CSAAS evidence in evaluating his (Nukida's) credibility.

In reviewing the instruction, it is apparent that the trial court should have used "her" instead of "his" in the last sentence of this instruction as the jury was to use Dr. Urquiza's testimony on child sexual abuse accommodation syndrome to evaluate Jane Doe's credibility. However, we do not agree that the mistaken pronoun led the jury to evaluate Nukida's credibility using Dr. Urquiza's testimony for two reasons: (1) it is more likely that "his" would refer back to Dr. Urquiza, not Nukida; and (2) evaluating Nukida's credibility using Dr. Urquiza's testimony would be illogical.

To explain, as the only testimony referred to in the instruction is Dr. Urquiza's, it is more likely that if the jury had been misled by the instruction, they would attribute the pronoun to Dr. Urquiza, not Nukida. Moreover, as explained clearly by Dr. Urquiza, the purpose of his testimony was to demonstrate potential reasons why child victims of sexual abuse may exhibit certain behaviors, such as delayed reporting, that dispelled prevailing myths about such victims. Accordingly, such testimony would only logically apply to the credibility of the victim's testimony, not the abuser.

Furthermore, we agree with the Attorney General that in considering the mistaken pronoun in light of the full instruction, it is not reasonably likely that the jury would have erroneously interpreted the instruction in the manner claimed by Nukida. Specifically,

27

the language immediately preceding the incorrect pronoun refers to "the conduct of someone who has been molested." Therefore, relying on the assumption that jurors are intelligent persons capable of understanding jury instructions as given, we believe the jury would not have misinterpreted this instruction as referring to Nukida's credibility, but reasonably understood that this referred to the credibility of the person who had allegedly been molested, Jane Doe. (See *Richardson, supra,* 43 Cal.4th at p. 1028.)

### b. Omission of Language Regarding Uncharged Conduct

Nukida next argues that the court erred in omitting language from CALCRIM No. 1193 regarding uncharged conduct. He indicates that CALCRIM No. 1193, in its original form, reads as follows:

"You have heard testimony from [expert's name] regarding child sexual abuse accommodation syndrome. [¶]

"Child sexual abuse accommodation syndrome relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse. [¶]

"[expert's name]'s testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against (him/her) *[or any conduct or crime[s] with which (he/she) was not charged].* [¶]

"You may consider this evidence only in deciding whether or not [alleged victim's name]'s conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of the alleged victim." (Italics added.)

Nukida argues that because the trial court did not include the bracketed language "or any conduct or crimes with which he was not charged," the jury could have used the CSAAS testimony as evidence that Nukida committed other acts of abuse against Jane Doe that were not charged but introduced at trial by the prosecution. Nukida therefore

28

contends that the jury may have impermissibly relied on such evidence as a basis for their guilty verdicts.  We find no merit to this contention.

In addition to CALCRIM No. 1193, the court provided the jurors with CALCRIM No. 1191A[9], which addresses the appropriate use of evidence regarding uncharged sex offenses.  The instruction specifically provides that such evidence can only be used to prove that the defendant committed the charged offenses of sexual abuse. Accordingly, if the jury used the CSAAS testimony as evidence Nukida committed the *uncharged* offenses, this would, in turn, violate the explicit language in CALCRIM No. 1193 that CSAAS testimony is not evidence he committed the *charged* offenses. Moreover, by testifying that CSAAS was not used to diagnose or give an opinion on whether someone was the victim of sexual abuse, Dr. Urquiza's testimony made it apparent that CSAAS evidence was not any indication of whether someone had committed any acts of sexual abuse – charged or uncharged.  (See *People v. Gonzalez* (2017) 16 Cal.App.5th 494, 504 [noting that the omission of language regarding uncharged offenses did not violate due process when viewed in context with other

---

[9] This instruction, as provided to the jury in Nukida's case, reads as follows: "The People presented evidence that the defendant committed the crime of Lewd Act Upon a Child that was not charged in this case.  This crime is defined for you in these instructions.  [¶]  You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense.  Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt.  A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.  [¶]  If the People have not met this burden of proof, you must disregard this evidence entirely.  [¶]  If you decide that the defendant committed the uncharged offense, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit Forcible Lewd Act Upon a Child and Lewd Act Upon a Child, as charged here. If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of Forcible Lewd Act Upon a Child and Lewd Act Upon a Child.  The People must still prove each charge beyond a reasonable doubt."

29

limiting instructions and content of expert testimony].) Accordingly, we conclude that there was no error in the trial court not including the bracketed language regarding uncharged offenses. As we find no instructional error in this regard, we reject Nukida's alternative argument that his trial counsel was ineffective for failing to object to the instruction. (See *People v. Poslof* (2005) 126 Cal.App.4th 92, 99 ["[w]here there is 'no sound legal basis for objection, counsel's failure to object to the admission of the evidence cannot establish ineffective assistance' "].)

### *c.   Harmless Error*

Nukida claims that the mistaken pronoun and omission of the bracketed language violated his due process rights by reducing the prosecution's burden of proving Nukida's guilt beyond a reasonable doubt. He therefore argues we must apply the federal standard test under *Chapman v. California* (1967) 386 U.S. 18, 24, which provides that constitutional error can be held harmless only if the court is able to declare a belief that the error was harmless beyond a reasonable doubt. However, even assuming that (1) there was instructional error, and (2) Nukida is correct concerning the standard to be applied, we conclude the error was harmless.

The record reflects that the evidence in support of Nukida's guilty verdicts was particularly strong and credible. Jane Doe provided substantial details regarding multiple incidents of sexual abuse and remained consistent in her explanations throughout cross-examination. Jane Doe also testified more than once that she chose not to disclose any of the abuse when it was happening because she was afraid of the family losing Nukida's full financial assistance, and E.V. and Nukida both confirmed that E.V. was fully dependent on Nukida for paying all the family's expenses. In addition, Nukida made numerous statements to Jane Doe during the first in-person meeting that reflected admissions or acknowledgments of guilt, including that: (1) he "didn't understand" why he had abused her; (2) apologizing for his behavior; (3) stating that his conduct was due to his "psyche": and (4) offering to go to jail for his behavior. Nukida made additional

30

statements reflecting his guilt during the second in-person meeting, where he apologized for his behavior once again, talked about going to see a hypnotist to find out what happened, and offered to do whatever he could to bring Jane Doe closure, including going to jail or killing himself.

In conclusion, even if we assume that the trial court erred in giving the challenged instruction, such an error was harmless because it is evident beyond a reasonable doubt that the jury would have still reached the same verdicts.

## C. *Cruel and Unusual Punishment Sentence*

Nukida argues for the first time on appeal that his sentence of 112 years eight months constitutes cruel and unusual punishment in violation under the Eighth Amendment of the federal Constitution and article I, section 17, of the California Constitution. He contends the aggregate sentence shocks the conscience, offends fundamental notions of human dignity, and is grossly disproportionate to his crimes.

### 1. *Forfeiture*

The Attorney General argues that Nukida has forfeited his claim by failing to object to the condition on cruel and unusual punishment grounds in the trial court. Although Nukida concedes this point, he nevertheless contends that we should reach the merits of his claim " 'in order to forestall a possible claim of ineffectiveness of counsel based on failure to object.' " Because we can easily resolve Nukida's claim on the merits, we will not address the issue of forfeiture and need not address the issue of ineffective assistance.

### 2. *Applicable Law and Standard of Review*

"Cruel and unusual punishment is prohibited by the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution. Punishment is cruel and unusual if it is so disproportionate to the crime committed that it shocks the conscience and offends fundamental notions of human dignity." (*People v.*

31

*Mantanez* (2002) 98 Cal.App.4th 354, 358, fns. omitted; see also *Ewing v. California* (2003) 538 U.S. 11, 20-23 (*Ewing*).)

"The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.' " (*Ewing*, *supra*, 538 U.S. at p. 20, quoting *Harmelin v. Michigan* (1991) 501 U.S. 957, 996-997.) " 'The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime.' " (*Ewing*, *supra,* 538 U.S. at p. 23.)

California's Constitution imposes a similar standard.  "[I]n California, a punishment may violate . . . the Constitution if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, superseded by statute on another ground.)  "The main technique of analysis under California law is to consider the nature both of the offense and of the offender.  [Citation.]  The nature of the offense is viewed both in the abstract and in the totality of circumstances surrounding its actual commission; the nature of the offender focuses on the particular person before the court, the inquiry being whether the punishment is grossly disproportionate to the defendant's individual culpability, as shown by such factors as age, prior criminality, personal characteristics, and state of mind." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494.)

The California Supreme Court has "distilled three analytical techniques to aid [a court's] deferential review of excessiveness claims: (1) an examination of the nature of the offense and the offender, with particular attention to the degree of danger both pose to society; (2) a comparison of the punishment with the punishment California imposes for more serious offenses; and (3) a comparison of the punishment with that prescribed in other jurisdictions for the same offense." (*In re Palmer* (2021) 10 Cal.5th 959, 973.)

"Disproportionality need not be established in all three areas." (*People v. Norman* (2003) 109 Cal.App.4th 221, 230.)

Whether a sentence constitutes cruel and unusual punishment is a question of law. (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1474.) A reviewing court therefore applies the de novo standard of review when determining whether a defendant's sentence is cruel and unusual. (*Ibid.*)

### 3. *Nukida's Sentence Does Not Constitute Cruel and Unusual Punishment*

In arguing that his sentence constituted cruel and unusual punishment, Nukida specifically points to the lack of physical force or weapons used in the commission of his crimes and his lack of any prior record. Nukida also notes that in comparison, other more serious crimes involving sexual conduct would not have triggered "full, separate, consecutive terms of imprisonment" under section 667.6.[10]

In analyzing the first prong of the test, we recognize that Nukida's lack of criminal history is a factor to be taken into consideration. With that said, Nukida's conduct involved 19 distinct charges, beginning from the time Jane Doe was only six years old until she was a teenager. The evidence reflects that he took advantage of his relationship with Jane Doe as a person of authority and trust by engaging in unwanted sexual conduct with her over numerous years. In addition, as noted by the Attorney General, section 288, subdivision (b) only requires that the force used be "substantially different from or substantially in excess of that required for the lewd act.' " (See *People v. Schulz* (1992) 2 Cal.App.4th 999, 1004.) Therefore, we assign little weight to his argument that there was "minimal physical force" used during the commission of the abuse. In summary, we

_____

[10] Section 667.6 provides, in relevant part, that "a full, separate, and consecutive term may be imposed for each violation of an offense specified in subdivision (e) if the crimes involve the same victim on the same occasion." (§ 667.6, subd. (c).) Section 288, subdivision (b) is one such offense specified in subdivision (e). (§ 667.6, subd. (e).)

cannot conclude that the factors cited by Nukida, when weighed against the severity of the offenses committed, render his sentence so disproportionate to his crimes as to shock the conscience. (See *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 530-531 (*Bestelmeyer*).)

With respect to the second prong, Nukida's argument primarily rests on the fact that the offenses for which he was convicted carry mandatory consecutive sentences under section 667.6, while other more serious crimes may be sentenced concurrently. We find no merit to this argument. As explained in *Bestelmeyer*, "[p]unishment is not cruel or unusual merely because the Legislature may have chosen to permit a lesser punishment for another crime. Leniency as to one charge does not transform a reasonable punishment into one that is cruel or unusual. [Citation.] When they enacted Penal Code section 667.6, subdivision (d) the Legislature chose to treat violent sex offense and violent sex offenders differently than other types of offenses and offenders." (*Bestelmeyer, supra,* 166 Cal.App.3d at pp. 530-531.) Therefore, given the nature of the charges against Nukida and the number of offenses committed, we cannot say that his sentence was grossly disproportionate or cruel and unusual solely because the crimes in question mandate consecutive, as opposed to concurrent, sentences.[11]

Finally, Nukida does not provide us with any information regarding the third prong. Therefore, we have no information from which to "conclude that other jurisdictions would have treated defendant more leniently than California for these multiple crimes of sexual abuse." (See *Bestelmeyer, supra,* 166 Cal.App.3d at p. 531.) Yet even if Nukida had demonstrated that other states would have imposed a more lenient sentence on him for the same crimes, this would not mandate reversal. "This state

---

[11] On reply, Nukida attempts to distinguish *Bestelmeyer* by noting that the sex offenses in that case involved "more egregious conduct" that were inherently violent. However, nothing in section 667.6 indicates that the offense in question must involve a certain degree of violence to justify the imposition of consecutive sentences. We therefore find this contention without merit.

constitutional consideration does not require California to march in lockstep with other states in fashioning a penal code. It does not require 'conforming our Penal Code to the "majority rule" or the least common denominator of penalties nationwide.' [Citation.]" (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1516.)

In conclusion, we find that Nukida's sentence did not constitute cruel and unusual punishment. As we find no merit in his Eighth Amendment claims, his counsel was not ineffective for failing to raise a meritless objection in the trial court. (See *People v. Lucero* (2000) 23 Cal.4th 692, 732.)

### D. Imposition of Restitution Fine

Nukida contends that the trial court erred in fining him $20,000 in restitution fund fines, which exceeded the maximum amount of $10,000 as provided under section 1202.4, subdivision (b). While the Attorney General concedes that this may have been error, he argues that because the trial court did not specify a statutory authority for the fines on the record, the matter should be remanded for the trial court to clarify its sentence and reduce the fine amount if appropriate.

As Nukida correctly states, the maximum amount for a restitution fund fine imposed under section 1202.4 is $10,000. (§ 1202.4, subd. (b)(1).) However, we find merit to the Attorney General's argument that the court may have intended to impose a fine under section 667.6, subdivision (f), which provides for a maximum fine of $20,000, to be paid to the Victim-Witness Assistance Fund, for anyone sentenced to specified sex crimes, including lewd or lascivious acts under section 288, subdivision (b).

Further, in reviewing the record, the transcript from Nukida's sentencing hearing reflects that the trial court imposed "$20,000 in fines," without reference to any particular statute. However, the minute order from the hearing indicates that this was a restitution fund fine imposed pursuant to "1202.4 PC." "Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)

Although we may ordinarily correct a court's minute order or abstract of judgment if it does not accurately reflect the oral pronouncement (see *People v. Mitchell* (2001) 26 Cal.4th 181, 185), we cannot do so in this case because the court did not specify the statutory authority for its order.

Accordingly, because the court could have permissibly imposed a maximum of $20,000 in fines under section 667.6, subdivision (f), we conclude that the appropriate remedy is to remand for the court to clarify its decision. However, if the trial court did in fact intend to impose the fine as a restitution fund fine pursuant to section 1202.4, subdivision (b)(1), we direct the court to reduce the amount to $10,000.

### III.    DISPOSITION

The judgment is reversed as to the restitution fine only and remanded for the court to clarify its ruling. The trial court is directed to specify the statutory authority for the fine and to exercise its discretion within the limits of that statute. The trial court is also directed to prepare an amended abstract of judgment and forward a certified copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

_____
                    Wilson, J.


WE CONCUR:




_____
        Greenwood, P.J.




_____
        Bamattre-Manoukian, J.




*People v. Nukida*
H050513